In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00225-CV

_____

IN RE COMMITMENT OF RODNEY DWAIN POLLARD

On Appeal from the 435th District Court
Montgomery County, Texas
Trial Cause No. 13-08-08648 CV

MEMORANDUM OPINION

Rodney Dwain Pollard (Pollard) appeals from a jury verdict that resulted in his civil commitment as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001-.151 (West 2010 & Supp. 2014) (SVP statute). Pollard raises six issues on appeal. In issues one through four, Pollard raises a factual sufficiency challenge to the jury's finding that he has a behavioral abnormality, complains about certain comments the trial court judge made during voir dire and in the presence of the jury, asserts he was prevented from asking a proper voir dire question, and argues the trial court erred in "gratuitously instructing the jury twice

1

that speculating is what experts do." In his fifth issue, he contends that he was denied the right to have counsel present during post-petition psychiatric examination. In his sixth issue, he maintains that this Court's recent decision in *In re Commitment of Richard*, No. 09-13-00539-CV, 2014 Tex. App. LEXIS 6974 (Tex. App.—Beaumont June 26, 2014, pet. denied) (mem. op.), *cert. denied*, No. 14-8485, 2015 U.S. LEXIS 2449 (Apr. 6, 2015), renders Chapter 841 unconstitutional. We affirm the trial court's judgment.

UNDERLYING FACTS

In December 1991, twenty-one year old Pollard committed the offense of aggravated sexual assault of C.P., a child under the age of fourteen. Pollard received ten years' probation. In 1995, Pollard violated his probation when he committed new offenses of aggravated kidnapping (with the intent to violate and abuse a child sexually) and aggravated sexual assault of D.M., a child under the age of fourteen. In 1995, the trial court revoked Pollard's probation, adjudicated his guilt for the December 1991 offense of aggravated sexual assault of a child, and sentenced Pollard to twenty years in prison. Pollard also pleaded guilty to the 1995 aggravated kidnapping charge of D.M., and Pollard was sentenced to twenty years in prison for that offense. At the time of the commitment trial, Pollard was serving both twenty-year sentences.

Pollard testified at the civil commitment trial that he met C.P. when Pollard was a substitute teacher at a junior high school, and C.P. was one of his students. At the time they met, C.P. was approximately thirteen years old. According to Pollard, he and C.P. would go bowling, go to the mall and the movies, and play basketball. Pollard explained that the first time he had sexual contact with C.P. was after a youth activity at the church where Pollard assisted with the youth group and where Pollard's father was the pastor. Pollard testified that he had sexual contact with C.P. over a four- or five-month period up until Pollard was arrested. Pollard stated that he knew that it was illegal to engage in sexual behavior with C.P., but Pollard felt like he "was in love with [C.P.]" Pollard and C.P. spray painted some school buildings and then Pollard and C.P. left for California. Pollard was arrested in California on a weapons charge. Pollard also pleaded guilty to the offense of "aggregate criminal mischief" and he received deferred adjudication in March 1992. According to Pollard, he and C.P. then "ran away" to Tennessee about three or four weeks later because Pollard "had the irrational belief that [they] were going to grow up and be lovers together one day." Pollard and C.P. returned to Texas after they "ran out of money[.]" After returning to Texas, Pollard continued to engage in sexual contact with C.P.

Pollard testified that while on probation for the offenses of aggravated sexual assault and aggregate criminal mischief, he continued to engage in sexual contact with underage males. One of those underage males was D.J. (also referred to as D.M.), an eight- or nine-year-old boy. According to Pollard, he asked D.J. "if he wanted to run away[,]" and they spent the night in Houston where Pollard had sexual contact with the child. Pollard sexually offended against D.J. "on several occasions[,]" and Pollard testified that he knew that it was illegal to sexually offend against D.M. and that it violated the terms and conditions of Pollard's probation. Pollard later pleaded guilty to kidnapping D.J. with the intent to violate and abuse him sexually.

Pollard testified that over his entire life, he had sexual contact with as many as thirty other boys. At his civil commitment trial, he testified specifically as to his sexual contact with multiple children, including but not limited to S.H., S.C., T.G., D.I., D.B., J.M., K.A., and J.B. Pollard testified that several of the boys were between eleven and fourteen years of age. He testified that he offended against some of these boys only five or six times, but as many as one hundred times against others. He met most of the boys either at church, where Pollard helped lead a youth group, or through sports, where Pollard coached several of the boys. Pollard also admitted that his offenses against some of these boys occurred while

Pollard was on probation or in sex offender treatment. He admitted to grooming at least one of these boys by "getting him to talk about sex"; and he also admitted that he also had sexual contact with other boys when he was as young as eleven years old and the victims were several years younger.

Pollard testified he has had sexual relationships while in prison even though it is against the rules to have sex in prison. Pollard admitted that he deliberately broke prison rules so he would not be moved to minimum custody because he wanted to remain in medium custody with his cellmate with whom he was in a sexual relationship. Pollard was "written up" twice for sexual misconduct while incarcerated. Pollard testified that at the time of trial he was currently in an eighteen-month sex offender treatment program and that he had previously received sex offender treatment in the early 1990s while on probation. At trial, Pollard acknowledged that he is a sex offender but stated that he is no longer sexually attracted to underage boys.

Pollard explained that during his sex offender treatment he had completed an "Offense Cycle Worksheet" wherein he identified his thoughts, needs, and irrational beliefs in order to understand his thinking at the time of his sexual offenses. Pollard explained the "stages" in his offense cycle and how he has learned methods for breaking the cycle. Pollard stated that  he would need to avoid

5

children "as often as possible[,]" and that his high risk situations would be "going to clubs, swimming pools, malls with arcades, anywhere where children would be gathered." According to Pollard, he "at one time could not control his urges towards teens and kids[,]" and he admitted at trial that he still has urges. He testified that he focuses more on people that are closer to his age, that he blamed himself for his offenses, and that he has learned about empathy in his sex offender treatment.

Dr. Lisa Clayton, board-certified in psychiatry and forensic psychiatry, testified as an expert for the State. Clayton testified she has evaluated prisoners for behavioral abnormality purposes for about fourteen years. She explained that in assessing Pollard, she used the methodology followed by other experts who perform this kind of evaluation in Texas, that her evaluation was done in accordance with her training as a forensic psychiatrist, and that her evaluation was done in accordance with the accepted standards within the field of forensic psychiatry. Clayton interviewed Pollard for about two hours and forty-five minutes. She also reviewed various records, including his prison records, his sex offender treatment records, offense records, police records, psychological records, and depositions. In Dr. Clayton's opinion, Pollard has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

Dr. Clayton diagnosed Pollard with "a severe, extensive sexual deviancy, pedophilia coupled with his personality disorder NOS with antisocial and narcissistic features." She explained that pedophilic disorder is a "lifelong" disorder that "doesn't go away [and] that's almost encoded into your brain and lasts throughout your lifetime." According to Clayton, a person diagnosed with pedophilic disorder has to "manage it 24 hours a day, 7 days a week for the rest of their lives[,]" and that it appears to her that Pollard has not managed it because "despite being in sex offender treatment and actually being through most of the treatment part of it, he still -- he's denying that he is -- has a sexual attraction to children." Clayton explained that in order for a person diagnosed with pedophilia to control the disorder and not reoffend, "they have to acknowledge that they have this deviancy and then work to control it." Clayton explained she diagnosed Pollard with "personality disorder NOS[,]" having traits of antisocial personality disorder and narcissistic personality disorder.

According to Dr. Clayton, when Pollard discussed his offenses with her he minimized them and "blamed the victim." She also explained that Pollard's continuous references during his testimony to his prepubescent victim as "Mr.[____]" is an example of Pollard's "thinking errors" in that he tries to make it seem to himself and others that his victims were adults. Another example Clayton

provided of Pollard's "thinking errors or deviant thinking" was the fact that Pollard referred to C.P. as his "accomplice" in the aggregate criminal mischief offense when actually C.P. was being victimized by Pollard. According to Clayton, in Pollard's testimony concerning his offense against D.B., "he made it sound like, you know, this eight-year-old boy said meet me and help me run away when in all reality he had told [D.B.'s] mother he was taking him to a park. And then they didn't come back." Clayton testified that Pollard also has not consistently reported the number of his sexual partners. In earlier evaluations he told other doctors that he had female sexual partners, but he reported to Clayton and testified at trial that he had not had any female sexual partners. Clayton explained that, in her opinion, these misrepresentations are significant in that they show that Pollard is lying "in order to look better" to himself or possibly to family and those evaluating him. Dr. Clayton testified that although Pollard denied threatening C.P., the records she reviewed showed that C.P. reported that Pollard had threatened C.P. physically. Clayton also explained that when she interviewed Pollard, he stated that he had only offended against D.M. one time for a "split second" on the night he was arrested, but the records indicate otherwise. Dr. Clayton noted that although Pollard stated in his deposition that he had between twenty and thirty victims, other records she reviewed indicated Pollard had approximately forty victims.

8

Dr. Clayton testified that at the time of trial she was still seeing evidence of Pollard's pedophilic disorder. When asked how Pollard's pedophilic disorder affects his emotional and volitional capacity, Clayton explained that Pollard's "sexual deviancy is so strong, his denial is -- is also so strong, his minimization is so strong that . . . he gravitates towards those children. And when he's out in the community he, again, gravitates to those children and he -- when he's around the -- prepubescent boys, he, he acts on his sexual urges." Clayton noted that, in a deposition "some 20 years later[,]" Pollard could recall virtually all his victims' names and what he had done with each of the boys "some 20 years later." Clayton testified that she found this significant because it shows that "he is most likely rethinking -- he has those on his mind and most likely, as pedophiles do, he fantasizes and rethinks about the events[.]"

Clayton also noted that Pollard misstated his own and his victims' ages at the time of the offenses in an effort to "shrink the age difference making the boys older and himself younger" to minimize "the sexual deviancy." Clayton considered this significant to her evaluation of Pollard because it shows "that he doesn't accept and doesn't take responsibility for his sexual deviancy and for how prevalent and pervasive his pedophilic urges are and how he has victimized others[,]" which is the first step for a pedophile in learning to control his

9

victimization of others. Clayton also testified that the fact that Pollard was victimizing several different boys at the same time was significant to her opinion regarding whether Pollard has a behavioral abnormality because it shows "how sexually preoccupied he is[.]" Clayton found it significant that Pollard had received disciplinary write-ups for sexual misconduct while incarcerated because it shows he is willing to get into trouble in order to satisfy his sexual desires. When asked the significance of the extent of offenses that Pollard committed prior to incarceration at age twenty-five, Clayton stated that, as of the time of trial, she had evaluated about 160 sex offenders, and that Pollard "has had in the shortest period of time the most extensive pedophilic activity that [she had] seen in [her] career."

Dr. Clayton testified that in reaching her opinion that Pollard has a behavioral abnormality, she considered Static-99R actuarial tests administered to Pollard and scored by two non-testifying psychologists. Clayton testified that Pollard's scores were in the "high range." Dr. Clayton stated that the following factors increase Pollard's risk of sexual re-offense: his pedophilic disorder, antisocial and narcissistic personality traits; his exclusively male victims, multiple victims at one time, and prepubescent age of his victims; the fact he offended on probation; his history of having the victims in his possession and taking them to places he does not have the authority to take them, including crossing state lines;

10

the fact that while he has been offending he has had weapons in his possession; and Pollard's relatively young age and good health, which means that he still has a sex drive and will be able to offend against victims for the next "30 plus years." Clayton identified some positive factors including: Pollard's two associate's degrees and other vocational certificates obtained while in prison; his employability; his participation in sex offender treatment; and his family being present at trial.

According to Clayton, at the time of trial Pollard had completed more than half of the eighteen-month sex offender treatment program. Clayton explained that research shows that people who have failed sex offender treatment are more likely to reoffend and, based on her evaluation, Pollard knows the treatment concepts but fails to apply them to himself. Clayton stated that, based on the records and after hearing Pollard's testimony at trial, she does not think Pollard has "internalized" or applied any of the concepts from sex offender treatment. Clayton testified that Pollard scored "extremely above average" on an IQ test, and that she believes he uses his intelligence to manipulate others and to get people to believe and trust him. Clayton testified that even if Pollard completed the current sex offender treatment program, she did not believe it would keep him from reoffending because Pollard's sexual deviancy is "a fight that he's going to have to have every

11

minute of every day for the rest of his life." As to Pollard's plans to not reoffend, Clayton was concerned that although he stated he would avoid high risk situations, he did not rule out going to church, and he did not seem to realize he could not be around his nephews.

On cross-examination, Clayton acknowledged that she is not a licensed sex offender treatment provider and that Pollard's sex offender treatment provider's notes state that Pollard was doing well in treatment and appeared motivated and to have a good understanding of treatment concepts. Clayton explained that Pollard's attempts at minimizing his victimization and making his victims seem like co-conspirators supported her opinion that he has not internalized his treatment. Clayton testified that she does not believe Pollard displays genuine remorse for his sexual offenses.

Lindsey Brown, a licensed sex offender treatment provider and a therapist in the sex offender treatment program at the Hightower Unit where Pollard is incarcerated, testified for Pollard. She explained that she had been Pollard's primary therapist while Pollard was undergoing sex offender treatment, and had worked with Pollard for over a year, seeing him on average two times a week in group therapy sessions and also for individual sessions. She admitted that Pollard has a history of covering things up and manipulating others, but when asked about

12

his participation in group therapy, she described him as "active and attentive." She agreed that she would describe Pollard as being motivated throughout his treatment. According to Brown, Pollard was on track to successfully complete the program, and he had already successfully completed the offense cycle portion. She explained that Pollard would always be at some risk of reoffending, that he would need more treatment after completing the eighteen-month program, and that the eighteen-month treatment program would only provide Pollard with a "baseline understanding of [his] issues and needs[.]"

Marisa Mauro, a forensic and clinical psychologist and licensed sex offender treatment provider, also testified for Pollard. Mauro testified that in her opinion Pollard does not suffer from a behavioral abnormality. Mauro diagnosed Pollard with "pedophilia, not exclusive, limited to males[,]" and she disagreed with Clayton's diagnoses of personality disorder and did not find Pollard to manifest any antisocial or narcissistic traits. Mauro explained that in evaluating Pollard for a behavioral abnormality, she reviewed records such as the initial multidisciplinary team reports, court documents, sex offender treatment program information, and then she interviewed Pollard and administered actuarial assessments including the Static-99R, the Static 2002R, and the PCL-R. According to Mauro, the methodology she used in evaluating Pollard is accepted by other professionals in

13

her field. After she interviewed Pollard, she received additional information including additional police records, sex offender program treatment records, depositions, and more details and statements from his victims, his victims' parents, and police.

Mauro testified she interviewed Pollard for approximately four-and-a-half hours. She described Pollard as "[v]ery cooperative" and "very forthcoming." Mauro testified that, based on what she learned from police records and in her interview with Pollard, he received convictions for offenses against two of his victims but "clinically, there is a potential for . . . maybe eight victims." She agreed that she saw in the records that a treatment provider had indicated that Pollard was a skilled manipulator, but Mauro did not see any evidence of Pollard being manipulative during her interview. Mauro testified that in her opinion Pollard "has a phenomenal amount of information about the concepts in sex offender treatment and has really worked to apply that to himself and identify what his cycle was when he was out there offending in the community." He admitted to Mauro during the interview that he groomed his victims, and that he gained their trust through spending time with them, buying them things, and through his positions as substitute teacher, church youth leader, and baseball coach. Mauro testified that she believed that at the time Pollard committed his offenses he could not identify

his grooming behavior and "get off that cycle[,]" whereas since participating in sex offender treatment, he can now identify grooming behavior. Mauro explained that Pollard is now more attracted to having intimate relationships with adults, and although he "might have a fantasy or have a deviant thought at times, he's able to use the tools that he's learned in sex offender treatment" to stop his thoughts.

Mauro described Pollard's understanding of the sex offender treatment concepts as "quite broad and deep." She explained that Pollard has "really seemed to internalize the sex offender treatment program concepts . . . identified his offense cycle [and] how to reduce his risk of relapse[,]" but she acknowledged that "there's no way to test that with any certainty" because there is no instrument or question that would measure his degree of internalization.

On the Static-99R actuarial, a measure that Mauro explained is used to predict sexual recidivism but does not take into consideration self-reported offenses not resulting in charges or an arrest, Pollard scored a "4" which Mauro explained is associated with a "moderate high" risk for reoffending and is associated with a predicted risk for sexual re-offense within five years of 8.7 percent. According to Mauro, the Static-2002R actuarial is a newer actuarial that, among other things, takes into consideration juvenile arrests for sexual offenses and community supervision violations. Pollard scored a "6" on the Static-2002R.

Mauro explained a score of "6" is associated with a "moderate" range for reoffending, and that the predicted risk for sexual recidivism for individuals with that score is six percent in five years. Pollard scored a "14" on the PCL-R, a measure of psychopathy; and Mauro explained that Pollard's score does not indicate psychopathy.

Mauro testified it is thought that pedophilia cannot be cured but "may wax and wane over time" and "may decrease over time along with sexual desire just as typical sexual desire decreases over time." Mauro identified the following as Pollard's risk factors for a sexual re-offense: his pedophilia diagnosis, more than two victims, victims younger than twelve years old, his young age, he had unrelated victims, and he had male victims. Mauro identified Pollard's protective factors as completing sex offender treatment (assuming he completes it), that he has family support and his family is aware of his offenses, and that he is educated and has work experience. Mauro stated she believed Pollard appeared remorseful, did not appear to minimize his sexual offenses, and did not appear sexually preoccupied. Mauro also stated that Pollard does not have antisocial personality disorder and that he lacks a significant substance use or abuse history, which she explained are neutral factors.

16

Mauro testified that although she believes Pollard has the inherited or acquired condition required for a behavioral abnormality, she does not believe Pollard has a behavioral abnormality because she does not believe he has serious difficulty controlling his behavior or that his emotional or volitional capacity is impaired so much that he is a menace to the health and safety of another individual. According to Mauro, Pollard's risk factors have reduced because he has aged while in prison, he has engaged in sex offender treatment and has learned the concepts and internalized them, and he has incorporated his family so that they can help hold him accountable.

FACTUAL SUFFICIENCY CHALLENGE

In Pollard's first issue, he argues the evidence is factually insufficient to support a beyond-a-reasonable-doubt finding that he has a behavioral abnormality. Pollard asserts that the main disputed issue at trial was whether he had learned through sex-offender treatment to control his behavior and not reoffend. Specifically, Pollard contends that there is insufficient evidentiary basis "for SPU-expert Clayton's opinion that Mr. Pollard fooled Mauro and Brown into believing that he has internalized the sex-offender-treatment concepts and taken control of his deviant sexual urges."

17

In reviewing a factual sufficiency claim in an SVP case, we weigh the evidence to determine whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that compels us to order a new trial. *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied). However, the risk of injustice arising from the weight of the evidence is necessarily slight when the jury uses a beyond-reasonable-doubt standard in deciding the case, and when the evidence admitted during the trial is legally sufficient to support the jury's verdict. *Id.* Nonetheless, "if in the view of the appellate court after weighing the evidence, the risk of an injustice remains too great to allow the verdict to stand, the appellate court may grant the defendant a new trial." *Id.*

Under the SVP statute, the State bears the burden of proving beyond a reasonable doubt that the person it seeks to commit for treatment is a sexually violent predator. Tex. Health & Safety Code Ann. § 841.062(a) (West 2010). As defined by the Legislature, a sexually violent predator is a person who "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a) (West Supp. 2014). The statute defines "'behavioral abnormality'" as "a congenital or acquired condition that, by affecting a person's emotional or

volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). Previously, we have stated that "[a] condition which affects either emotional capacity or volitional capacity to the extent a person is predisposed to threaten the health and safety of others with acts of sexual violence is an abnormality which causes serious difficulty in behavior control." *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied).

In this case, the jury heard Pollard's testimony and the evidence regarding his offenses and victims. The jury heard evidence that Pollard continued to sexually offend while on probation. The jury also heard conflicting opinions from Clayton and Mauro relevant to whether Pollard has the ability to control his behavior and whether Pollard is likely to reoffend. The jury heard evidence about Pollard's risk factors for reoffending as identified by both experts. Dr. Clayton expressed her opinion that even if Pollard completed the current sex offender treatment program, Pollard's sexual deviancy is "a fight that he's going to have to have every minute of every day for the rest of his life." Clayton explained that research shows that offenders who do not internalize sex-offender-treatment concepts are more likely to reoffend and that, in her opinion, Pollard had not

19

internalized those concepts. Mauro expressed her opinion that she does not believe Pollard has a behavioral abnormality because she does not believe he has difficulty controlling his behavior or that his emotional or volitional capacity is impaired so much that he is a menace to the health and safety of another individual. Mauro testified that Pollard's risk factors have reduced because he has aged while in prison, he has engaged in sex offender treatment and has learned the concepts and internalized them, and he has incorporated his family so that they can help hold him accountable. On this record, the evidence allowed the jury to draw reasonable inferences from basic facts to determine ultimate issues and to resolve conflicts and contradictions in the evidence by believing all, part or none of the testimony. *See In re Commitment of Burnett*, No. 09-09-00009-CV, 2009 Tex. App. LEXIS 9930, at *13 (Tex. App.—Beaumont Dec. 31, 2009, no pet.) (mem. op.); *In re Commitment of Grinstead*, No. 09-07-00412-CV, 2009 Tex. App. LEXIS 228, at *20 (Tex. App.—Beaumont Jan. 15, 2009, no pet.) (mem. op.).

We conclude that, as sole judge of the weight and credibility of the evidence, the jury could reasonably conclude that Pollard suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Muzzy*, 2014 Tex. App. LEXIS 4750, at *8 (Tex. App.—Beaumont May 1, 2014, pet. denied (mem. op.); *see also In re Commitment of*

20

*Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied). Based on the jury's findings, the jury implicitly determined that Pollard has serious difficulty controlling his behavior and is likely to commit predatory acts of sexual violence directed toward individuals for the primary purpose of victimization. *See Muzzy*, 2014 Tex. App. LEXIS 4750, at **8-9. The jury could infer serious difficulty controlling behavior based not only on the expert's testimony, but also on Pollard's past behavior and testimony. *See id.* Weighing all of the evidence, we conclude the verdict does not reflect a risk of injustice that compels ordering a new trial. *See Day*, 342 S.W.3d at 213. Issue one is overruled.

COMMENTS BY THE TRIAL COURT JUDGE

In Pollard's second issue, he contends that the trial court judge made "[a]n improper gratuitous comment" during voir dire, and that the comment was "so harmful that it could not have been cured by an instruction to disregard." During voir dire by the State, counsel for the State asked if any of the venire members or any of their friends or family members were a victim of sexual assault. One of the venire members indicated that a friend's ex-husband sexually abused the friend a couple of times and the offenses resulted in a conviction. The following exchange then occurred:

[STATE'S COUNSEL]: And is there anything about that experience that will affect your ability to listen to the facts of this case, the law as the Judge gives it to you and make a decision?

VENIREPERSON: Yeah. With my background and I'm a retired pastor and teacher and with that experience, it's been my experience that people who have that situation tend to repeat. And I would be more likely to -- to go "yes" on the --

THE COURT: More likely concerning the questions, can you keep an open mind and listen to the evidence and make the basis of your determination based on the evidence and the laws as I already gave it to you or have you already made up your mind?

VENIREPERSON: Pretty much made up my mind.

THE COURT: "Pretty much" means you haven't made up your mind.

VENIREPERSON: Ninety-five percent.

THE COURT: What percent?

VENIREPERSON: Ninety-five percent.

THE COURT: We have to pin everybody down.

VENIREPERSON: Pardon me, Judge? Did you say 100 percent?

THE COURT: Right. Have you made up your mind?

VENIREPERSON: Yes. I didn't hear all of what you said. I'm sorry. Thank you.

THE COURT: Okay. Thank you.

[STATE'S COUNSEL]: Thank you very much, sir, for your honesty.

22

THE COURT: We don't like to seat jurors with closed minds in the State of Texas. That's a rule.

[STATE'S COUNSEL]: I mean -- and sometimes it's just a better -- it is a better fit for another jury, not just this particular case. So thank you very much.

Pollard contends that the "closed minds" comment was "entirely unnecessary and gratuitous and unequivocally conveyed in a derogatory manner to the entire venire" that the trial court believed the venire member had a "closed mind." According to Pollard, the comment went beyond the considerable discretion a trial court has to control the trial proceedings, and that the comment was "clearly capable of prejudicing Mr. Pollard's rights and affecting the deliberative process." Pollard concedes he did not object at trial to the comment, but argues he can raise the "improper comment" issue for the first time on appeal because "this Court cannot conclude with any confidence that an instruction to disregard would have rendered the trial court's improper 'closed minds' comment harmless."

To preserve error regarding a judge's comments during a trial, a party must both object to the comment when made and request an instruction, unless an instruction concerning the comment would not have rendered the comment harmless. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *In re Commitment of Vanzandt*, 156 S.W.3d 671, 674 (Tex. App.—Beaumont 2005, no

23

pet.). The party complaining that a court's comments were improper bears the burden to explain how such comments were incurable by an instruction and that it would excuse the claimant's failure to preserve error. *See In re Commitment of Stuteville*, No. 01-13-00921-CV, 2015 Tex. App. LEXIS 2243, at **33-34 (Tex. App.—Houston [1st Dist.] Mar. 10, 2015, pet. filed) (mem. op.).

A party complaining of an alleged improper comment by the trial court must show not only that the trial court's comments were improper but also that the improper comment caused harm. *See World Car Nissan v. Abe's Paint & Body, Inc.*, No. 04-12-00457-CV, 2013 Tex. App. LEXIS 9442, at *8 (Tex. App.—San Antonio July 31, 2013, pet. denied) (mem. op.). "We examine the record as a whole to determine whether the comment unfairly prejudiced the complaining party." *Id.* We will reverse the judgment only when the trial court's comments are improper and probably caused the rendition of an improper judgment. *Id.* at **7-8; *In re Commitment of Barbee*, 192 S.W.3d 835, 847 (Tex. App.—Beaumont 2006, no pet.); *see also* Tex. R. App. P. 44.1(a).

The record shows that Pollard failed to object to the comments during voir dire and that he failed to ask for any instructions to mitigate the impression he claims the trial court's comments gave the jury. However, on appeal he argues that

he had no obligation to object to these comments because the resulting harm could not have been cured by a proper instruction.

We disagree. Assuming, without deciding, that the trial court's comments were improper, we conclude that Pollard's complaints about these matters could have been cured by a proper instruction. On request, the trial court could have instructed the jury to disregard its remarks and could have explained that, under Texas law, bias or prejudice of a prospective juror for or against a party disqualifies the prospective juror from serving on the jury. *See* Tex. Gov't Code Ann. 62.105(4) (West 2013). Such an instruction, in our opinion, would have been a sufficient remedy that would have cured any alleged prejudice that might relate to the trial court's comments at issue. Nevertheless, even if the comments were improper, Pollard has also failed to demonstrate that the comment was harmful and probably caused the rendition of an improper judgment. Issue two is overruled.

VOIR DIRE QUESTIONING

In his third issue, Pollard asserts that the trial court erred "when, after sua sponte interrupting and taking over Mr. Pollard's voir dire, it prevented Mr. Pollard from asking a proper voir dire question." The following exchange occurred during the defense's voir dire:

> [DEFENSE COUNSEL]: Now, if the State was able to prove that there were two sexually violent offenses in the past -- just going to go

25

row by row -- who here believes that he would be likely to do it again? That somebody who did that would be likely to do it again.

Row 1? One through 4? That's one, two, three, four.

Number 5, why don't you believe that somebody would not be likely to do it again?

VENIREPERSON: I don't -- get to make a new choice every day, I guess. I don't know.

[DEFENSE COUNSEL]: Okay.

Next row. If the State was able to show two or more offenses, who believes he would be likely to do it again? So this is six, seven, eight, nine, ten, eleven -- everybody on this row. Eleven, twelve, thirteen, fourteen and fifteen.

. . . Okay. Second part of this row. The State shows two or more offenses, is he likely to do it again?

Number 20. Okay.

Moving back to the third row. Anybody on the third row? I need cards, guys. I practice in this courtroom a lot, but not enough to know where everybody's sitting. Okay.

So, 21, 22, 23, 24, 25, 26, 27. Okay.

Second half of this row. Thirty-one, 35. Okay.

Next row. Okay. Number 37. Thank you. Thirty-nine, 40, 41, 42, 43. Three of you. Forty-four and 46. Okay.

Small row? Forty-seven, 48 and 49.

Back row? Fifty, 51, 52, 53, 54, 57.

Jury box. This is confusing because y'all are numbered before them. So if all of you that answered the question in the affirmative just raise your cards. Fifty-eight -- 58, 60 -- 58, 60, 61, 66, 68 and 69.

THE COURT: Ask the follow-up question. Everybody can follow the law, though, as I gave it to you in the State of Texas that says in order to find somebody is a sexually violent predator they have to have the two prior offenses and the State has to prove the behavioral abnormality. Can everybody follow that law? I went through that once with you. Anybody change their attitude about that? Okay.

VENIREPERSON: I have got a question.

26

THE COURT: What's your number?

VENIREPERSON: Fifteen.

I thought the question was if somebody who's done it twice do you think they are going to do it again.

THE COURT: That's what she asked. I'm asking you the legal question which is -- the law requires --

VENIREPERSON: Yeah.

THE COURT: Before you convict somebody of a sexually violent predator, they have to have the two prior offenses and they have to have a behavioral abnormality.

VENIREPERSON: Correct.

THE COURT: Anybody can't follow that law? That's what we need to know. Okay.

[DEFENSE COUNSEL]: Is there anybody who believes it's enough just to have two offenses? That if you see there to be two offenses, you won't need to hear any evidence about behavioral abnormality?

THE COURT: I've asked that same -- I've asked that question once already.

[DEFENSE COUNSEL]: That's the question.

THE COURT: We need to know the answer to that. Is everybody okay with that?

VENIREPERSON: Yes.

VENIREPERSON: Yes.

VENIREPERSON: Yes.

27

VENIREPERSON: Yes.

VENIREPERSON: Yes.

THE COURT: Okay.

Pollard contends that the trial court prevented him from asking his question, which not only inquired into whether the members of the venire would require proof of both elements required by the SVP statute, but which also inquired into whether the members of the venire would automatically answer both elements in the affirmative "based solely on proof of 'two sexually violent offenses' (which was a different inquiry from and not covered by the trial court's 'follow the law question[']')." According to Pollard, the trial court's actions in "treating these two inquiries as essentially the same inquiry, . . . potentially allowed prospective jurors who would have automatically answered both elements affirmatively based solely on proof of 'two sexually violent offenses' to serve on the jury." Pollard claims he was precluded from using his peremptory challenges on those members of the venire who may have been challengeable for cause on that basis.

In reviewing complaints regarding voir dire, we consider the entire examination of the jury panel, and not just the answers of individual jurors. *Barbee*, 192 S.W.3d at 846. "Voir dire examination is largely within the sound discretion of the trial judge and . . . broad latitude is allowed for examination."

28

*Cortez v. HCCI – San Antonio, Inc*., 159 S.W.3d 87, 92 (Tex. 2005). We disagree with Pollard's contention that the trial court prevented him from asking a proper question during voir dire or that the trial court "improperly interrupted" defense counsel's voir dire. After the venire members answered defense counsel's question regarding whether the venire members would automatically answer both elements required by the SVP statute in the affirmative based solely on "two sexually violent offenses[,]" the trial court instructed defense counsel to ask a follow-up question. The trial court also instructed the jury as to the State's burden of proof under the SVP statue. The Texas Supreme Court has specifically stated in a sexually violent civil commitment case that "[l]itigants have the right to question potential jurors to discover biases and to properly use peremptory challenges." *In re Commitment of Hill*, 334 S.W.3d 226, 228 (Tex. 2011). Nevertheless, trial courts are allowed to exercise reasonable control over voir dire; therefore "refusals to allow lines of questioning during voir dire are reviewed under an abuse of discretion standard." *Id.* at 229. An abuse of discretion occurs if the "denial of the right to ask a proper question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges." *Babcock v. Nw. Mem'l Hosp*., 767 S.W.2d 705, 709 (Tex. 1989). To preserve error when the trial court refuses to allow proper questions, the record must show the party made "a timely request to

29

the trial court, stating the specific grounds for the ruling [the party] desired, and [that the party] obtained a ruling from the court." *Id.* at 708.

The record before us shows that the trial court did not prevent Pollard from asking a follow-up question. Furthermore, the trial court properly instructed the jury that a person has to have both "two prior sexual offenses" and a "behavioral abnormality" before the jury can find that person to be a sexually violent predator. We cannot say that the trial court abused its discretion. *See In re Commitment of Winkle*, 434 S.W.3d 300, 313-14 (Tex. App.—Beaumont 2014, pet. filed) (citing *Dow Chem. Co.*, 46 S.W.3d at 240) (trial court's allegedly improper comments are reviewed as a question of law). Issue three is overruled.

## TRIAL COURT'S COMMENT REGARDING EXPERTS

In his fourth issue, Pollard maintains that the trial court committed reversible error in "gratuitously instructing the jury twice that speculating is what experts do." The first comment by the trial court occurred when the State asked Dr. Clayton if it sounded familiar that Pollard was a youth pastor in Beaumont. Defense counsel stated, "Objection. Speculation." The trial court responded, "Overruled. That's what experts do. We pay them for their education and experience to do that." The second comment by the trial court occurred when the State asked Dr. Mauro how many individuals in an actuarial's normative group

30

have had at least twelve victims.[1] Defense counsel objected on the basis of speculation, and the trial court stated, "She's an expert. That's what they do." Pollard argues that experts cannot rely on speculation, and that the trial court's comments were harmful because the comments improperly informed the jury that it could render the verdict that it did even though the jury could have reasonably believed that the experts' testimony was speculative.

A trial court has great discretion in the manner it conducts a trial. *In re Commitment of Wirtz*, 451 S.W.3d 462, 470 (Tex. App.—Beaumont 2014, no pet.). We review a trial court's allegedly improper comments as a question of law. *Barbee*, 192 S.W.3d at 847. On appeal, the complaining party must show that the comments were improper, and then show that the improper comments prejudiced the complaining party. *Id.* "We examine the record as a whole to determine whether the comment unfairly prejudiced the complaining party." *World Car Nissan*, 2013 Tex. App. LEXIS 9442, at *8. We will reverse only when the trial court's comments are improper and probably caused the rendition of an improper judgment. *Id.* at **7-8; *see also* Tex. R. App. P. 44.1(a).

---

[1] The parties in their briefs state that this comment by the trial court occurred during the State's questioning of Dr. Clayton. As noted above, the comment by trial court occurred during the State's questioning of Dr. Mauro.

31

On this record, and even assuming without deciding that the trial court's comments were improper, Pollard has not shown that either of the comments probably caused the rendition of an improper judgment. The record is silent as to whether any particular juror was improperly influenced by the trial court's comments. The experts testified as to the purpose for which they were hired, their education and experience, and the information they relied upon in forming their opinions. Furthermore, in its jury charge, the trial court instructed the jury, "[y]ou are the sole judges of the credibility of the witnesses and the weight to give their testimony." We assume that the jury followed the trial court's instruction. *See Day*, 342 S.W.3d at 199. Accordingly, the record does not demonstrate that the trial court's comments influenced the jury to reach a verdict it would not have otherwise reached. *See World Car Nissan*, 2013 Tex. App. LEXIS 9442, at **7-8; *see also* Tex. R. App. P. 44.1(a). Issue four is overruled.

## RIGHT TO COUNSEL

In his fifth issue, Pollard argues that the trial court committed reversible error by denying him the right to have his attorney present at the post-petition psychiatric examination conducted by the State's expert prior to trial. Pollard asserts this issue presents a "de novo question of statutory construction," and he argues that this Court's ruling in *In re Commitment of Smith*, 422 S.W.3d 802, 804-

32

06 (Tex. App.—Beaumont 2014, pet. denied), was based solely on a concession by Smith that the SVP statute defined a civil commitment proceeding as a "trial or hearing" and does not appear to encompass a post-petition psychiatric examination. We recently addressed and rejected the same arguments in *In re Commitment of Lujan*, No. 09-14-00230-CV, 2015 Tex. App. LEXIS 1615, at \*\*16-18 (Tex. App.—Beaumont Feb. 19, 2015, no pet.) (mem. op.). For the same reasoning outlined in *Lujan*, we reject Pollard's arguments and overrule issue five.

## IN RE COMMITMENT OF RICHARD

In his sixth issue, Pollard contends that this Court's decision in *In re Commitment of Richard*, 2014 Tex. App. LEXIS 6974, renders Chapter 841 unconstitutional. We recently addressed and rejected this same argument in *In re Commitment of Lucero*, No. 09-14-00157-CV, 2015 Tex. App. LEXIS 1098, at \*\*24-29 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.). For the same reasoning outlined in *Lucero*, we reject Pollard's arguments and overrule issue six.

Having overruled all of Pollard's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on December 3, 2014
Opinion Delivered June 25, 2015

Before Kreger, Horton, and Johnson, JJ.

34