In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00186-CV**
_____


**IN RE COMMITMENT OF JOHN WAYNE HICKS**

_____

**On Appeal from the 88th District Court**
**Hardin County, Texas**
**Trial Cause No. 57373**

_____

**MEMORANDUM OPINION**

Pursuant to the Sexually Violent Predators Act, a jury unanimously found beyond a reasonable doubt that John Wayne Hicks is a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.061–.062 (West 2017). The trial court adjudicated him as a sexually violent predator and civilly committed him for sex-offender treatment and supervision. Hicks presents two issues for our consideration on appeal. Hicks contends the evidence is legally and factually insufficient to support a finding beyond a reasonable doubt he has a behavioral abnormality that

1

makes him likely to engage in a predatory act of sexual violence. We overrule both issues and affirm the trial court's judgment.

## Standard of Review

The commitment of a person as a sexually violent predator is a civil proceeding. *In re Commitment of Fisher*, 164 S.W.3d 637, 645–53 (Tex. 2005). The State must prove beyond a reasonable doubt that a person is a sexually violent predator, which is the same burden of proof the State has in criminal cases. *See* Tex. Health & Safety Code Ann. § 841.062(a). Therefore, we employ the same legal sufficiency standard of review applied in criminal cases. *See In re Commitment of Barbee*, 192 S.W.3d 835, 839 (Tex. App.—Beaumont 2006, no pet.) (citing *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2003, pet. denied)). We examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the elements required for civil commitment as a sexually violent predator beyond a reasonable doubt. *See Mullens*, 92 S.W.3d at 885 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 887 (citations omitted).

A factual sufficiency standard of review is no longer employed in criminal cases. *See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010). However, we continue to utilize the factual sufficiency standard of review in sexually violent predator commitment proceedings as established by the Court of Criminal Appeals in criminal cases. *See Barbee*, 192 S.W.3d at 839 (citations omitted). Under that standard, "we view all of the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt." *In re Commitment of Day*, 342 S.W.3d 193, 206 (Tex. App.—Beaumont 2011, pet. denied) (quoting *In re Commitment of Gollihar*, 224 S.W.3d 843, 846 (Tex. App.—Beaumont 2007, no pet.)). "To reverse a case on a factual sufficiency challenge, we must be able to say that the great weight and preponderance of the evidence contradicts the jury's verdict or that the verdict is clearly wrong or manifestly unjust." *Id.* (quoting *Gollihar*, 224 S.W.3d at 846).

**Sufficiency of the Evidence**

The jury learned Hicks pled guilty on two separate occasions to charges of aggravated sexual assault of a child through testimony and other records admitted at trial. Specifically, Hicks successfully completed deferred adjudication for the first offense, but he violated the terms of his deferred adjudication for the second offense and was adjudicated guilty. His first offense of aggravated sexual assault of a child

3

was against his stepdaughter. The evidence showed the abuse began when the stepdaughter was eleven years old. Hicks admitted to some version of the assault in front of the jury, but he attempted to minimize his culpability. A statement he gave to police around the time of the assault was admitted into evidence which graphically depicted assaults occurring on multiple occasions during a short period of time. At trial, when asked to explain the discrepancies in his testimony and his written statement, he indicated he did not "remember none of it." Hicks's testimony regarding the offense against his stepdaughter was contradictory. Initially, Hicks testified that at the time of the incident, he believed his eleven-year-old stepdaughter was a willing participant. He then indicated that after going through the classes and programs, he did not believe she was a willing participant; however, he subsequently confirmed he still felt his stepdaughter was sexually curious, and he believed she wanted to have sex with him. Additionally, Hicks testified that his stepdaughter came on to him about five times or so, and there "was a lot of times that she tried and I wouldn't do nothing." Hicks also explained to the jury that his feelings of rejection and being let down led him to offend against his stepdaughter. As a term of his deferred adjudication for this offense, he attended a sexual offender treatment program for ten years.

The second offense, and the one for which he was adjudicated guilty, was committed against an eighteen-month-old child he was babysitting. Although Hicks admitted at trial that he pled guilty to aggravated sexual assault, he denied doing anything wrong to the baby or that she was his victim. This assault occurred a few years after he was released from supervision for the first offense. Hicks began a treatment program for sexual offenders while in prison and continued to receive treatment at the time of trial.

Hicks also testified regarding his difficulty keeping a job. He indicated he had no support except for his mother. He also attempted to explain how he violated the terms of deferred adjudication by nonpayment of fees; however, his expert indicated that he violated other rules as well.

The State called psychiatrist Dr. David Self to testify as an expert. Dr. Self described the methodology he uses when performing an evaluation and testified he used the same methodology in this case. He indicated he reviewed the records from multiple sources. Dr. Self testified that he did not score any tests, but he reviewed the results of actuarial tests provided. He explained how he arrived at his opinion in this case, which included empirical research and risk factors.

Dr. Self met with Hicks in November of 2016 for about an hour and a half. Dr. Self indicated Hicks provided a minimized version of the offense against his

5

stepdaughter when they met, like the version Hicks provided to the jury. Dr. Self indicated that Hicks's minimization was significant because his refusal to "own his behavior" made it almost impossible to prevent it from happening again.

Dr. Self discussed how the age of the victims and their family status impacted his evaluation of risk factors. He also explained the wide age gap of his victims provides an opportunity for a large number of potential victims. Dr. Self testified that the younger the child is, the more deviant the act is, so he would consider that as a risk elevator. Dr. Self testified that the persistence of Hicks's deviant interest after punishment coupled with the fact that Hicks engaged in a more deviant act following punishment was significant and showed he could not help himself.

Dr. Self described the clinical factors he found significant in Hicks; he was sexually deviant, and he has nonexclusive pedophilic disorder with a female preference. Dr. Self explained pedophilic disorder as an abnormal desire to have sex with prepubescent children and described the diagnostic criteria for that disorder. He indicated the criminal history of Hicks supported that diagnosis. Dr. Self confirmed that pedophilic disorder was a chronic condition for Hicks. Dr. Self agreed pedophilic disorder is a congenital or acquired condition. Dr. Self opined that it affected Hicks's emotional or volitional capacity as evidenced by the fact that he

6

went through the rigors of deferred adjudication once and received messages about how wrong the behavior was, then proceeded to do a more egregious thing.

Dr. Self explained that Hicks's denial was indicative of a tolerant attitude toward sexual assault. Dr. Self did not diagnose Hicks as being antisocial but testified he had adult antisocial behaviors related to these sex acts. Dr. Self indicated Hicks's intellectual ability was significantly below average, but he was not intellectually disabled. Dr. Self explained that intellectual deficit is associated with an increased risk of offensive behavior. Dr. Self considered borderline intellectual functioning a risk factor for Hicks and doubted Hicks had good insight into his offending. Dr. Self considered Hicks to be a treatment failure. Specifically, Dr. Self testified Hicks was kicked out of his second treatment program for "fail[ing] to progress," and he was not attending regularly. Dr. Self explained why it was significant that Hicks did not complete the sex offender treatment. Dr. Self told the jury that Hicks is currently in a TDCJ treatment program, but he did not learn much from reviewing the records except that Hicks had difficulty digesting the material and repeatedly failed tests.

Hicks and Dr. Self also discussed his plans for release, which Dr. Self deemed unrealistic. Dr. Self explained that Hicks does not have a good support system in place, and Hicks's plan to avoid sexual re-offense was to stay away from children.

7

Dr. Self acknowledged Hicks's score of 1 on the Static-99R, which indicated a low to moderate risk to reoffend; however, Dr. Self testified he did not feel the test result was an accurate representation of Hicks's risk to reoffend. Dr. Self testified that Hicks's risk of re-offense was moderate to high and above average. Dr. Self explained the ultimate factors that underline the determination that Hicks has a behavior abnormality include the pedophilic disorder, Hicks acting upon it, the manner in which he acted upon it, with whom he acted on it, and the projected instability of his life upon release. Dr. Self believed Hicks suffers from a behavioral abnormality defined in Chapter 841 making him likely to engage in a predatory act of sexual violence.

Psychologist Dr. John Fabian testified as an expert on Hicks's behalf. Dr. Fabian defined a behavioral abnormality by quoting the statute and stated it is "a congenital or acquired condition that, by affecting a person[']s emotional or volitional capacity, predisposes a person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person."

Dr. Fabian met with Hicks for several hours in December of 2016. Dr. Fabian outlined the records he reviewed prior to meeting with Hicks, which included a sex offender risk assessment, police reports, witness statements, TDCJ records, and records regarding the prior offense history. Dr. Fabian indicated he reviewed Hicks's

life history, offense history, performed a Personality Assessment Inventory, and administered an IQ test.

Additionally, Dr. Fabian testified about the actuarial tests used to assess Hicks, including the Static-99R and PCL-R. He also explained how the Static-99R measures risk factors. Dr. Fabian agreed it was important to look at dynamic risk factors as well, even though they do not appear on the Static-99R. Dr. Fabian described how he administers a Static 99 and explained the scoring. He indicated Hicks scored a 1 on the Static-99R and described how he arrived at that score. Dr. Fabian agreed it was possible for someone to have a score of zero or lower and still have a behavioral abnormality, but it was unlikely. He opined Hicks is a low risk to reoffend based on his Static-99R score.

Dr. Fabian also described the Hare Psychopathy Checklist Revised (PCL-R) assessment, which measures criminal personality traits. His testimony revealed he did not administer a PCL-R to Hicks, but he scored the instrument as he saw fit based on his review of the records, Hicks's background, and the interview. Dr. Fabian testified Hicks scored an 18 on the PCL-R, which indicated Hicks has mild psychopathic traits that are below average among other inmates in general inmate populations. Dr. Fabian testified the trend is to now look more at dynamic factors which do not appear on these tests.

9

Dr. Fabian indicated that Hicks's age lowered his risk to reoffend. He also considered that Hicks's victims were acquaintances, which the doctor claimed indicated a lower risk to reoffend than someone who assaults strangers. Finally, Dr. Fabian believed that the fifteen-year span between offenses indicated Hicks had some control over his behavior. However, Dr. Fabian agreed Hicks's risk of re-offense could elevate if he experienced "negative emotionality." Dr. Fabian also agreed past behavior is a good predictor of future behavior. He indicated it was important to consider the details of a person's offense in the evaluation for purposes of diagnosis, but the heinousness of the crime is not related to risk. Dr. Fabian agreed there was an issue in the age gap of his victims, eighteen months to eleven years, which is a diversity in age that was unusual and a risk factor. Dr. Fabian agreed Hicks had been in treatment for four months and was still not completely acknowledging responsibility. He indicated Hicks was low functioning and it was possible that his level of functioning could make it difficult for him to gain insight into his sexual offending.

Although Dr. Fabian diagnosed Hicks with pedophilic disorder and considered him to be sexually deviant, he did not believe Hicks had a condition that predisposed him to commit a sexually violent offense to the extent he is likely to be

a menace to the health and safety of another person. He ultimately characterized Hicks's risk of reoffending as low.

## Analysis

In a civil commitment proceeding under Chapter 841 of the Texas Health and Safety Code, the State must prove a person is a sexually violent predator beyond a reasonable doubt. Tex. Health & Safety Code Ann. § 841.062(a). To be a "sexually violent predator," an individual: (1) must be a repeat sexually violent offender; and (2) suffer from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a) (West 2017). "Behavioral abnormality" is defined by statute to mean "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2) (West 2017); *see also In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied) ("A condition which affects either emotional capacity or volitional capacity to the extent a person is predisposed to threaten the health and safety of others with acts of sexual violence is an abnormality which causes serious difficulty in behavior control.").

The parties do not dispute Hicks is a repeat violent sexual offender on appeal.[1] The parties disagree that he has a behavioral abnormality that makes it likely he will engage in a predatory act of sexual violence. In the case before us, the State's expert and defense expert diagnosed Hicks with pedophilic disorder. Likewise, both experts considered him to be sexually deviant, and Hicks had previously admitted to having "deviant thoughts". Indeed, the State's expert characterized Hicks's offense against the eighteen-month-old as "off the charts deviant." Dr. Self testified that the younger the child is, the more deviant the act is, which he considered a risk elevator. Dr. Self explained that the persistence of Hicks's deviant interest after punishment and the fact that he engaged in a more deviant act after punishment indicated "he just was unable to control himself."

Moreover, both experts testified regarding Hicks's refusal to fully accept responsibility and minimization. The State's expert explained this revealed a tolerant attitude about sexual assault, which is a risk factor. The defense expert similarly acknowledged with respect to the PCL-R that some of the higher risk behaviors he found were criminal versatility, failure to accept responsibility for one's own

---

[1] The trial court granted the State's motion for directed verdict that Hicks was a repeat violent sexual offender.

12

actions, conning and manipulative behavior, promiscuous sexual behavior, and revocation of conditional release.

Although Dr. Fabian agreed Hicks suffered from pedophilic disorder, he disagreed with the State's expert that this condition made it likely Hicks would reoffend. He relied on Hicks's Static-99R score, which was 1. Dr. Self categorized Hicks's risk to reoffend as moderate to high and testified the factors that underline his determination Hicks has a behavioral abnormality included the pedophilic disorder, the fact that he acted on it, the way he acted on it, with whom he acted on it, and a projected instability of Hicks's life upon release. The State's expert focused on the fact Hicks had been through a treatment program for his first offense and was aware of how negatively society viewed this behavior yet went on to engage in even more deviant behavior afterwards, which indicated a lack of control and a risk factor for reoffending. Indeed, even Hicks's expert acknowledged there is a trend to emphasize dynamic factors over static factors.

At trial, despite his assertions that he took responsibility, Hicks indicated his stepdaughter was the instigator when the first offense occurred. Specifically, Hicks's testimony revealed he still believed his eleven-year-old stepdaughter to be a willing participant. He told the jury she came on to him repeatedly and there "was a lot of

13

times that she tried and I wouldn't do nothing." He also admitted during trial that he assaulted his stepdaughter while other children slept in the bed with them.

The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Mullens*, 92 S.W.3d at 887. "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Mullens*, 92 S.W.3d at 887). The jury could have discounted the testimony of Hicks's expert entirely, partially, or simply given more credence to the State's expert with respect to Hicks's risk factors and the likelihood he would reoffend. Both experts agreed he suffered from pedophilic disorder, which the United States Supreme Court has noted is "a mental abnormality that critically involves what a lay person might describe as a lack of control." *See Kansas v. Crane*, 534 U.S. 407, 414 (2002). The State's expert felt Hicks was at a moderate to high risk of reoffending and explained the underlying factors that led to that conclusion. Where an expert witness provides a basis for their opinion and that basis is supported by the record, the jury resolves any conflicts or contradictions with respect to the expert's testimony. *In re Commitment of Rushing*, No. 09–11–00268–CV, 2012 WL 4466421, at *5 (Tex. App.—Beaumont Sept. 27, 2012, no pet.) (mem. op.) (citing

14

*Thota v. Young*, 366 S.W.3d 678, 695 (Tex. 2012); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

Although the principal issue in a commitment proceeding is whether a person is predisposed to sexually violent conduct, in the present case "the diagnosis of [a] mental disorder[ ] informed the experts' opinions regarding whether" Hicks has a "behavioral abnormality that makes him likely to engage in a predatory act of sexual violence." *See In re Commitment of Williams*, No. 09–14–00407–CV, 2016 WL 1600789, at *4 (Tex. App.—Beaumont Apr. 21, 2016, no pet.) (mem. op.). While the experts disagreed regarding Hicks's risk to reoffend by committing a sexually violent offense following his release and drew different conclusions from the same evidence, each expert articulated their reasoning to the jury and why the evidence supported that reasoning. *See id.* at *5. Each expert explained to the jury the factors they considered in evaluating Hicks's risk of reoffending, including the use of the actuarial instruments and other dynamic factors, and the jury could determine what weight to give to each expert's testimony. *See id.*; *Rushing*, 2012 WL 4466421, at *5.

Other considerations for the jury were the age of the victims and the fact that Hicks assaulted an eighteen-month-old. The jury could have determined that the assault on the eighteen-month-old, despite receiving ten years of treatment for a prior

15

sexual offense and being punished for the prior offense, was evidence of Hicks's lack of control. The jury also could have placed significant weight on Hicks's own words, in which he attempted to justify the assault against his stepdaughter by stating she "came onto him" and was "sexually curious." The jury was the sole judge of Hicks's credibility and the weight to be given to his testimony, as well. *See Mullens*, 92 S.W.3d at 887.

## Conclusion

When examining the evidence in the light most favorable to the verdict, we determine a rational jury could find beyond a reasonable doubt that Hicks is a sexually violent predator, and therefore, the evidence is legally sufficient to support the verdict. *See* Tex. Health & Safety Code Ann. § 841.062(a); *Mullens*, 92 S.W.3d at 885, 887. We likewise conclude the evidence is factually sufficient to support the jury's finding. Weighing all the evidence, the verdict does not reflect a risk of injustice compelling us to order a new trial. *See Day*, 342 S.W.3d at 213. We overrule issues one and two. We affirm the trial court's judgment and order of commitment.

AFFIRMED.

_____
CHARLES KREGER
Justice

16

Submitted on July 9, 2018
Opinion Delivered March 7, 2019

Before McKeithen, C.J., Kreger, and Johnson, JJ.