

# IN THE
# TENTH COURT OF APPEALS

### No. 10-17-00129-CV

## IN RE THE COMMITMENT OF S.D.

**From the 54th District Court
McLennan County, Texas
Trial Court No. 2016-1391-2**

## MEMORANDUM OPINION

A jury found that Appellant Sylvester Dixon is a sexually violent predator, and the trial court ordered Dixon civilly committed pursuant to the Civil Commitment of Sexually Violent Predators Act (the SVP Act). *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.003, 841.081. Dixon has appealed, contending in his sole issue that "[t]he trial court committed reversible error by admitting evidence about [his] unadjudicated offenses." We will affirm.

### Background

At Dixon's civil-commitment trial, the State first offered, and the trial court admitted as evidence, exhibits showing Dixon's prior convictions for murder in 1972, indecency with a child in 1980, indecency with a child in 1985, and indecency with a child

(habitual) in 1991. The State then called Dixon as its first witness. The State questioned Dixon about the details of the 1972 murder. Dixon had pleaded guilty to the crime and had been sentenced to thirty-five years' imprisonment; however, Dixon acknowledged that he had been released on parole in 1980. The State then questioned Dixon about the details of the 1980 indecency-with-a-child offense. Dixon denied that he had committed the crime; however, he acknowledged that he had pleaded guilty to the offense and that he had been sent back to prison in 1980. Dixon had been sentenced to five years' imprisonment for the 1980 indecency-with-a-child offense but had been released from prison again in 1983.

The State was thereafter questioning Dixon about whether he had committed sexual offenses against C.D., the victim of the 1985 indecency-with-a-child offense, when the State asked Dixon about whether he had also committed sexual offenses against W., C.D.'s brother. Dixon has never been convicted of committing any offense against W., and, at trial, Dixon denied having committed any offense against W. Dixon also denied that he had committed any offense against C.D., but he stated that he had pleaded guilty to the 1985 indecency-with-a-child offense[1] and that he had been sent to prison for the third time in 1985. Dixon had been sentenced to ten years' imprisonment for the 1985 indecency-with-a-child offense but had been released again in 1988.

The State then questioned Dixon about whether he had committed sexual offenses against R. Like W., Dixon has never been convicted of committing any offense against

---

[1] The trial court's judgment indicates that Dixon actually pleaded nolo contendere.

R., and, at trial, Dixon denied having committed any offense against R. The State also asked Dixon about whether he had committed sexual offenses against J. Like W. and R., Dixon has never been convicted of committing any offense against J., and, at trial, Dixon denied having committed any offense against J. Dixon testified that he had, however, remained in jail while the case regarding J. was pending.

The State was thereafter questioning Dixon about whether he had committed sexual offenses against A.B., the victim of the 1991 indecency-with-a-child offense, when the State asked Dixon about whether he had also committed sexual offenses against L., A.B.'s sister. Like W., R., and J., Dixon has never been convicted of committing any offense against L., and, at trial, Dixon denied having committed any offense against L. Dixon also denied that he had committed any offense against A.B.; however, Dixon admitted that he had pleaded guilty to the 1991 indecency-with-a-child offense, had been sentenced to forty years' imprisonment for the crime, and had returned to prison for the fourth time in 1991.

Dixon testified that while in prison for the fourth time, he had been in a sex-offender treatment program for approximately sixteen months. Dixon stated that he had then been released from prison again in May 2006, at which time he had moved into a halfway house for about two years. Dixon said that he had participated in sex-offender treatment at the halfway house as well. Dixon acknowledged, however, that his parole had then been revoked and that he had been sent back to prison in May 2008. When the State asked Dixon about whether his parole had been revoked because he had sexually assaulted another resident in the halfway house, Dixon initially denied it, but, after

further questioning, Dixon acknowledged that he had committed a sexual offense against another resident of the halfway house.

Finally, at the time of his trial in January 2017, Dixon testified that he was set to be released from prison again in early 2018. Dixon acknowledged that he was no longer in sex-offender treatment. The State then asked Dixon, "But you do realize that you need further help so you can avoid creating more victims?" Dixon replied, "Well, I don't think so, because when I - - because when I was out - - when I was out, I - - I didn't mess with no kids. I didn't go around them."

After Dixon testified, the State called psychiatrist Dr. Michael Arambula as a witness. Dr. Arambula testified that he was asked to evaluate Dixon to determine whether Dixon has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Arambula explained that in conducting his evaluation, he interviewed Dixon and also "looked at the investigative and legal records associated with all of Mr. Dixon's offenses," including the investigative records for offenses that did not lead to convictions. Based on his evaluation of Dixon and his review of the records, Dr. Arambula opined that Dixon has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Arambula testified that the clinical diagnosis that correlates to Dixon's sexual deviance is pedophilia—a typically chronic condition in which someone is sexually attracted to children and acts on his or her urges and sexual preferences. Dr. Arambula further stated that he has also diagnosed Dixon with a personality disorder with antisocial features.

Dr. Arambula then testified that the facts of each sexual offense were important in helping him reach his opinion regarding Dixon. The State asserted that it therefore wanted to ask Dr. Arambula about each of Dixon's sexual convictions individually, beginning with the 1980 indecency-with-a-child conviction. In response to the State's questioning, Dr. Arambula testified that the types of records that he reviewed and relied upon with regard to the offense were investigative records, including statements taken from the victim. When the State asked Dr. Arambula what the records said about the offense, the following exchange took place:

> [Dixon's Counsel]: Objection, Your Honor. I'm going to object to hearsay. I'm also going to request - -
>
> THE COURT: Overruled.
>
> [Dixon's Counsel]: Your Honor, I'm also going to request a running hearsay instruction regarding the information contained in Dr. Arambula's records that he reviewed.
>
> . . . .
>
> THE COURT: Okay. I overrule the objection, give you a running objection.
>
> [Dixon's Counsel]: And may I request a limiting instruction?
>
> THE COURT: Yes, you may.
>
> Members of the Jury, hearsay is a statement the declarant does not make while testifying at the current trial and a party offers in evidence to prove the truth of the matter asserted in the statement. Generally, hearsay information is not admissible. Certain hearsay information contained in records reviewed by the expert may be admitted before you through the expert testimony. Such hearsay information is admitted only for the purpose of showing the basis of the expert's opinion and to allow you to assess the weight and credibility of the expert's opinion. However,

this hearsay information cannot be considered as evidence to prove the truth of the matter asserted.

Dr. Arambula then testified about what the investigative records upon which he had relied had said about the 1980 indecency-with-a-child offense, what Dixon had told him about the 1980 indecency-with-a-child offense, and what significance Dixon's explanation of the offense had in light of the investigative records.

The State then began questioning Dr. Arambula about Dixon's 1985 indecency-with-a-child conviction. In response to the State's questioning, Dr. Arambula first explained the significance of the timing of this second sexual offense. Dr. Arambula then stated that he had looked at the investigative records regarding the offense and that the records indicated that there were two male victims in the case, C.D. and W. Like his testimony regarding the 1980 indecency-with-a-child offense, Dr. Arambula thereafter testified about what the investigative records upon which he had relied had said about the 1985 indecency-with-a-child offense, what Dixon had told him about the 1985 indecency-with-a-child offense, and what significance Dixon's explanation of the offense had in light of the investigative records. Dr. Arambula's testimony about the 1985 indecency-with-a-child offense also included testimony about an unadjudicated offense that Dixon had allegedly committed against W.

The State then questioned Dr. Arambula as follows:

> Q    Were there any other alleged victims that you read about from this same time period?
>
> A    Yes, ma'am.
>
> Q    And who was that?

A    Let's see.  There was another girl, uh, a 12 year old named "[A.S.];"[2] somebody named "[R.]," who was five; and then [J.] who was nine.

Q    And starting with [R.], what do the records indicated happened with her?

[Dixon's Counsel]:  Objection, Your Honor.  Again, mention of these names, uh - - or alleged victims, these have not been substantiated.

THE COURT:  Overruled.

THE WITNESS:  The investigative records indicated that she complained that he, um, used two fingers to rub her bottom.  He rubbed her privates and that it happened many times.

[Dixon's Counsel]:  Objection, Your Honor.  Um, may I also request a running objection under 403?

THE COURT:  I grant you a running objection.

Q    (BY [State's Counsel])  Now, as far as, uh, [W.] and [R.] goes, Mr. Dixon was not convicted of offending against them; is that right?

A    That's correct.

Q    Uh, but do you still take that information into account regarding your evaluation?

A    Well, I don't disregard it.  I don't attach as much weight if somebody had not been convicted of it, uh, but I still - - it's still there.  And so it's important to consider everything in a medical evaluation.

The State then questioned Dr. Arambula about Dixon's 1991 indecency-with-a-child conviction.  In response to the State's questioning, Dr. Arambula first explained the significance of committing another sexual offense after having spent time in prison twice

---

[2] A.S. was the victim of the 1980 indecency-with-a-child offense.

for similar offenses. When then asked whom the victim of this third sexual offense was, Dr. Arambula replied that there were two victims indicated—A.B. and L. Like his testimony regarding the 1980 and 1985 indecency-with-a-child offenses, Dr. Arambula thereafter testified about what the investigative records upon which he had relied had said about the 1991 indecency-with-a-child offense, what Dixon had told him about the 1991 indecency-with-a-child offense, and what significance Dixon's explanation of the offense had in light of the investigative records. Dr. Arambula's testimony about the 1991 indecency-with-a-child offense also included testimony about an unadjudicated offense that Dixon had allegedly committed against L.

Finally, the State asked Dr. Arambula about J. Dr. Arambula testified about what the investigative records upon which he had relied had said about what had taken place with J. This included testifying that the investigative records showed that J. had alleged that Dixon had committed a sexual offense against him and testifying about the significance of J.'s allegations. Dr. Arambula acknowledged in his testimony, however, that the charges against Dixon with regard to J. were ultimately dismissed.

When then asked by the State if, other than committing the foregoing offenses against children, Dixon had acted out sexually in any other way in recent years, Dr. Arambula responded that during Dixon's most recent time on parole, Dixon had been sexually inappropriate at the halfway house where he had been living, which resulted in the revocation of his parole. Dr. Arambula stated that the incident was significant because Dixon had not accepted any responsibility for the incident even though, at the time, he had been in a sex-offender treatment program for a year and a half. Dr.

Arambula further testified that the recent records that he had reviewed also showed that Dixon still has fantasies of children, which is very recent evidence of Dixon's chronic pedophilia.

**Discussion**

As stated above, Dixon contends in his sole issue that the trial court committed reversible error by admitting evidence about his unadjudicated offenses. We assume without deciding that Dixon has preserved this issue for appellate review, and we review the trial court's evidentiary rulings for an abuse of discretion. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Dixon first argues that the admission of evidence about his unadjudicated offenses violated Rule of Evidence 404. Rule 404(b)(1) prohibits the admission of evidence of a crime, wrong, or other act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). The evidence about Dixon's unadjudicated offenses, however, was not admitted to prove his character in order to show that, on a particular occasion, he acted in accordance with that character. Instead, as explained below, the evidence was admitted to prove the allegations in the State's petition that Dixon is a sexually violent predator as defined by the SVP Act.

Under the SVP Act, a person is a sexually violent predator if the person "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.003(a). Regarding the first element, a person is a repeat sexually violent

offender if, as relevant here, the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses. *Id.* § 841.003(b). Regarding the second element, a "behavioral abnormality" is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A "predatory act" is defined as "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

Evidence about the accused's past sexual offenses, both adjudicated and unadjudicated, assists in demonstrating whether the accused has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence—the ultimate issue that the jury must determine in an SVP Act case. *See In re Commitment of Miller*, 262 S.W.3d 877, 894 (Tex. App.—Beaumont 2008, pet. denied). Such evidence assists in demonstrating whether the accused has a behavioral abnormality even if the evidence is presented through a witness other than an expert. Therefore, the trial court did not abuse its discretion in allowing the State's line of questioning to Dixon about the unadjudicated offenses before Dr. Arambula had explained how he used the offenses in forming his opinion. Nevertheless, having an expert in an SVP Act case explain the facts he considered, including the accused's past sexual offenses, both adjudicated and unadjudicated, and how those facts influenced his evaluation, also assists the jury in weighing the expert's opinion on the ultimate issue. *In re Commitment of Stuteville*, 463 S.W.3d 543, 555 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

The evidence about Dixon's unadjudicated offenses was therefore admitted to prove the allegations in the State's petition that Dixon is a sexually violent predator as defined by the SVP Act—not admitted to prove Dixon's character in order to show that, on a particular occasion, he acted in accordance with that character. Thus, the admission of evidence about Dixon's unadjudicated offenses did not violate Rule of Evidence 404(b). *See* TEX. R. EVID. 404(b)(1); *cf. Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991) ("Circumstances of the offense which tend to prove the allegations in the indictment are not extraneous offenses.").

Dixon next argues that in this case, the details of his unadjudicated offenses were presented to inflame the passion of the jury and that the admission of such details caused him substantial prejudice. Rule of Evidence 705(d) regarding expert testimony states that "[i]f the underlying facts or data would otherwise be inadmissible, the proponent of [an expert] opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." TEX. R. EVID. 705(d). Rule of Evidence 403 further provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* R. 403. Factors considered when applying the Rule 403 balancing test "include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence." *See Stuteville*, 463 S.W.3d at 555

(quoting *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied)).

Dixon first contends that the evidence about his unadjudicated offenses had little probative value because Dr. Arambula did not give much weight to the unadjudicated offenses. Dixon argues that this case is therefore unlike other cases in which the expert relied on the accused's adjudicated *and* unadjudicated offenses to formulate the expert's opinion that the accused had a behavioral abnormality. But Dr. Arambula did not testify that, in conducting his evaluation, he did not give much weight to unadjudicated offenses. Instead, Dr. Arambula testified that, in conducting his evaluation, he gave less weight to unadjudicated offenses than he did to convictions but that it was important to consider everything in a medical evaluation. Dr. Arambula's testimony therefore confirms that the evidence about Dixon's unadjudicated offenses had probative value and assisted the jury in understanding his opinion that Dixon suffers from a behavioral abnormality. *See id.* at 556.

Dixon next argues that the explicit details of the unadjudicated offenses had a strong potential to impress the jury in an irrational way. Dixon asserts that this is particularly true because the State was allowed to question, and Dr. Arambula was allowed to testify, about Dixon's unadjudicated offenses "as if they were reliable and resulted in final convictions (of which Dixon disputed)" instead of as the "raw allegations that they actually are." However, the State's line of questioning and Dr. Arambula's testimony made it clear that some of the offenses were adjudicated while others were unadjudicated. Furthermore, to deter Dr. Arambula's testimony about the offenses from

impressing the jury in an irrational way, the trial court gave a limiting instruction to the jury after Dixon objected that Dr. Arambula's testimony about the information contained in his records was hearsay. An almost identical limiting instruction was then included in the jury charge. It stated in relevant part, "[C]ertain hearsay information contained in records reviewed by an expert or experts was admitted before you through expert testimony. Such hearsay was admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted." We presume the jury followed the trial court's limiting instructions. *See In re Commitment of Day*, 342 S.W.3d 193, 199 (Tex. App.—Beaumont 2011, pet. denied).

Dixon finally argues that the jury probably improperly based its decision on his unadjudicated offenses given the amount of time that the State spent on its line of questioning about the unadjudicated offenses. Dixon notes that, even during closing arguments, the State showed the jury a PowerPoint slide that stated, "4 years free, 7 child victims." And the State declared: "So starting in 1966 up until, uh 2017, he has only been four years free. Four years in the free world if you add it all up, from 1966 until 2017, four years free. And we know at least seven child victims. Seven kids . . . ." However, given the purpose for admitting the evidence, as explained above, we conclude that the admission of evidence about Dixon's unadjudicated offenses was not unfairly prejudicial. *See In re Commitment of Winkle*, 434 S.W.3d 300, 309 (Tex. App.—Beaumont 2014, pet. denied) ("While Rule 403 of the Rules of Evidence allows the exclusion of relevant evidence on special grounds, it should be used sparingly.").

In light of the foregoing, we conclude that the trial court did not abuse its discretion in admitting evidence about Dixon's unadjudicated offenses. We therefore overrule Dixon's sole issue.

## Conclusion

We affirm the trial court's judgment.


REX D. DAVIS
Justice


Before Chief Justice Gray,
    Justice Davis, and
    Justice Neill
Affirmed
Opinion delivered and filed January 8, 2020
[CV06]

